UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Mark Koscielski,

Plaintiff,

vs.

City of Minneapolis, and
Jeffrey Douglas Ho,

Defendants.

Civil No. 00-425 JRT/FLN

**REPORT AND RECOMMENDATION**

---

John D. Moss for Plaintiff.
Peter W. Ginder for Defendants.

---

**THIS MATTER** came for a hearing before the undersigned United States Magistrate Judge on July 6, 2001, on Defendants' Motion for Summary Judgment [#26]. For the reasons which follow, the Court Recommends that Defendants' Motion be granted.

## I. FACTUAL BACKGROUND

On October 13, 1999, Officers Jennifer Goodmanson and T.R. Peterson executed a search warrant at 3547 Harriet Avenue South, Minneapolis, Minnesota. (Goodmanson Aff.). The search marked the culmination of an investigation that began when a Confidential Reliable Informant ("CRI") provided information to Officers Goodmanson and Peterson regarding a narcotics trafficker who used the alias "Cody." (Goodmanson Aff. ¶ 1). The CRI also told Goodmanson that "Cody" frequently carried a firearm and was involved in the illegal sale of firearms. (Id.). "Cody" was later identified as Lee Cody Wilson. Id. The CRI told the officers that Cody was a black male who used the cellular telephone number (612) 823-2923, and also provided a description of Cody's motor vehicle. (Id.; Exh. 1).

FILED NOV 6 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD____
DEPUTY CLERK____

Officer Goodmanson contacted U.S. West and learned that the telephone number (612) 823-2923 was assigned to Lee Wilson at 3547 Harriet Avenue South, Minneapolis, Minnesota. (Id.). An inquiry to the Minneapolis police revealed that Lee Cody Wilson had recently been arrested and provided the same address to the authorities. (Id.). Further inquiry to the Minnesota Department of Motor Vehicles revealed that Lee Cody Wilson's drivers' license listed the same address, and that a 1982 Toyota Tercel with license plate number "558 NKV" was registered to Wilson. (Id.).

Officer Goodmanson then drove past 3547 Harriet Avenue South and saw a Toyota motor vehicle with license plate "558 NKV" parked in the rear of the building. (Id.). An inquiry to the Minneapolis RECAP Unit revealed that 3547 Harriet Avenue South is a single family dwelling homesteaded to Daniel Lundeen. (Id.). Plaintiff testified at his deposition that the building is two stories high and has single entrances at the front and back. (Koscielski Dep. pp. 16, 20-21).

The next step in the investigation was to complete a controlled purchase of narcotics from Wilson. Goodmanson arranged for a CRI to purchase crack cocaine from Wilson at a pre-arranged location. (Goodmanson Aff., Ex. 1). The CRI made a controlled purchase using pre-recorded buy money of a substance that later field-tested positive as crack cocaine. (Id.). The purchase was observed by Minneapolis police who later informed Goodmanson that they observed a black male fitting Wilson's description leave 3547 Harriet Avenue South and travel to the meet location prior to the purchase. (Id.). Wilson then returned to 3547 Harriet Avenue South. (Id.).

An NCIC check of Wilson revealed that he was convicted in 1991 for terroristic threats and that there was a felony warrant for his arrest on charges of aggravated assault in Indiana. (Id.).

Based upon this information, Goodmanson prepared an application for a search warrant. (Id.). The warrant was signed by Judge Thomas Wexler of the Hennepin County District Court on

October 13, 1999, who approved Goodmanson's request for a "no knock" entry. (Id.). Goodmanson's "no knock" request was made because: (1) she was unable to determine where Wilson allegedly stored his narcotics and firearms; (2) the shades were drawn in the residence creating an increased risk to officers; (3) the suspect was a fugitive with a violent arrest history; and (4) contraband could potentially be destroyed. (Id.). Judge Wexler authorized both the search and the no-knock entry because it was necessary to "prevent the loss, destruction, or removal of the objects of said search and to protect the safety of the peace officers." (Id.).

After the warrant was signed, Goodmanson contacted Sergeant Michael Young of the Minneapolis Police Department's Emergency Response Unit ("ERU"). (Goodmanson Aff. ¶ 2). After discussing the investigation with Goodmanson, Young agreed to have the ERU assist in the execution of the warrant at 8:00 p.m. on October 13, 1999. (Id.; Young Aff. ¶ 1).

Immediately prior to the execution of the warrant, officers observed Wilson and two women leave the residence in Wilson's vehicle. (Goodmanson Aff. ¶ 3). Uniformed officers stopped the vehicle a short distance from the residence and verified that Wilson was the driver. (Id.). One of the women informed the officers that three other men resided in Wilson's residence, that each roommate had his own bedroom, and that it was unknown whether the other occupants were involved in narcotics or weapons trafficking. (Id.). Although Wilson was in custody, Officers Peterson and Goodmanson decided to proceed with the "no-knock" entry because of the presence of other men in the residence and their unknown involvement with narcotics and drugs. (Goodmanson Aff. ¶ 4; Peterson Aff. ¶ 1).

The warrant team held a meeting at Fifth Precinct headquarters to discuss the planned raid. (Peterson Aff. ¶ 1). Dr. Jeffrey Ho, an Emergency Room physician who is also employed by the

City of Minneapolis as Director of their Medical Support Team ("MST"), attended the meeting. (Ho Aff. ¶¶ 1, 2). The MST provides medical support for ERU operations. (Id.). In addition to regular ERU operations, Dr. Ho has been specifically trained to assist in high risk entry situations. (Id.). Dr. Ho has attended numerous specialized training courses, including use of force and subject restraint, tactical emergency medical roles and responsibilities, weapons familiarization, and the aforementioned high risk warrant entry. (Id. at ¶¶ 3 and 4). Dr. Ho was also trained in the use of handcuffs, the ASP baton, mace, and pepper spray. (Id. at ¶¶ 4 and 5). Dr. Ho carried all of these weapons during ERU operations. (Id.).

The ERU team made the initial entry into Wilson's residence and secured it so that it could be searched by members of the Narcotics Unit. (Id. ¶ 7; Young Aff. ¶¶ 1 and 2; Peterson Aff. ¶¶ 1 and 2). One ERU team searched the main floor and basement while the second team searched the second story. (Ho Aff. ¶ 8). Dr. Ho entered the residence behind the first team. (Id.).

When Officer Young went through the back door into the residence, he saw Plaintiff Mark Koscielski sitting at the kitchen table counting the daily receipts from his gun shop. (Young Aff. ¶ 1). Plaintiff had a loaded .40 caliber pistol tucked into his waistband underneath his sweatshirt, which he is lawfully licensed to carry. (Koscielski Dep. pp. 24-25; Koscielski Aff. ¶ 7). When Koscielski heard the sound of the officers' forced entry, he sought cover behind the back door of the house. (Id. at 27; Young Aff. ¶ 1). Upon opening the door, Plaintiff saw a policeman pointing a gun at his face and decided to immediately lie down on the ground. (Id. at 28-29; Young Aff. ¶ 1). One of the policemen, Officer Hentges, shouted out that Plaintiff was a "good guy." (Koscielski Aff. ¶ 6). Plaintiff was then instructed to lie down on the floor, which he did. (Id.). That there was some confusion at this point is evidenced by the fact that Sergeant Michael Young then called out that

"someone had a gun," apparently in reference to Officer Hentges. (Id.).

Officer Young concedes that Plaintiff should have been restrained at that point. (Young Aff. ¶ 1). He was not. (Id.). Instead, the ERU teams proceeded into the house and searched it, ramming numerous locked interior doors in the process. (Young Aff. ¶ 1). This action was taken to ensure that no one was present who could present a danger to the officers. (Id. at ¶¶ 1, 2).

Dr. Ho then entered the kitchen, while the house was still being searched. Plaintiff felt Dr. Ho brush him, place his knee into Plaintiff's lower back, pull his arms back, and handcuff him. (Koscielski Dep. pp 35-41, 72-73). Plaintiff cautioned Dr. Ho that he had a bad back. (Id. at pp. 33-39, 48-49). While he was being handcuffed, the pressure on his back increased. (Id. at pp. 37-38). After Plaintiff was handcuffed, Dr. Ho removed the gun from Plaintiff's waistband and took his weight off Plaintiff's back. (Id. at p. 49). Dr. Ho applied the handcuffs extremely loosely such that they fell off Plaintiff's arms when he wiggled them. (Id. at pp. 41-42).

Dr. Ho alleges that he handcuffed Plaintiff because Plaintiff was armed, unsecured, and unidentified. (Ho. Aff. ¶ 9). Dr. Ho did so because during his training he learned that unsecured people roaming free behind the entry team are a safety risk. (Id.).

When another officer recognized Plaintiff, he was permitted to stand up and was led over to a kitchen chair. (Koscielski Dep. pp. 43-44). Plaintiff noticed that his back had begun to hurt. (Id.). Dr. Ho, still standing in the kitchen, detected no difficulty in Plaintiff's movement, determined that he was medically stable, and departed the scene shortly thereafter. (Id.; Koscielski Dep. p. 57).

Once the interior of the residence was secure, the Narcotics Unit entered the premises and began a search. (Peterson Aff. ¶ 6). Officers soon discovered that 3547 Harriet Avenue South was an unlicensed boarding house, and contacted Judge Wexler for instruction as to how the search

should proceed. (Id.). Judge Wexler directed the officers to limit their search to Wilson's bedroom and the common areas of the residence. (Id.).

While searching the kitchen, Goodmanson saw Koscielski sitting at the kitchen table and heard him complain about his back. (Id.). Approximately one hour after the raid began, Goodmanson retrieved Koscielski's medications and cell phone from his truck. (Id.; Koscielski Dep. pp. 64-67). Koscielski was permitted to leave and drove himself to the hospital at approximately ten p.m. (Koscielski Dep. pp. 67-70).

As a result of the injury that Plaintiff sustained, he was required to undergo surgery and to incur substantial expense for his treatment. (Koscielski Aff. ¶ 9).

## II. CONCLUSIONS OF LAW

### A. Standard of Review

The Supreme Court has held that summary judgment is to be used as a tool to isolate and dispose of claims or defenses that are either factually unsupported or based on undisputed facts. See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986); Hegg v. U.S., 817 F.2d 1328, 1331 (8th Cir. 1987); Fisher v. Pharmacia & Upjohn, 225 F.3d 915, 919 (8th Cir. 2000). Federal Rule of Civil Procedure 56(c) provides, in relevant part, that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986) (holding that the Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). When considering a motion for summary judgment, a court should construe all evidence in

favor of the non-moving party. See Anderson, 477 U.S. at 255. However, if the evidence submitted by the non-moving party is merely colorable or is not significantly probative, summary judgment may be granted. Id. at 249-50.

The party opposing summary judgment may not rest upon the allegations set forth in its pleadings, but must produce significant probative evidence demonstrating a genuine issue for trial. Id. at 248-49. "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247-48. If the opposing party fails to carry that burden, summary judgment should be granted. See Celotex, 477 U.S. at 322.

**B. Claims Against the City of Minneapolis**

This case arises under Title 42 United States Code, Section 1983. In three separate causes of action, the Plaintiff asserts that under color of law, the City violated various of his constitutional rights. In particular, Plaintiff claims that the City of Minneapolis violated his right to be secure against unreasonable searches and seizures, deprived him of his liberty and property without due process of law, denied him the equal protection of the laws, and invaded his privacy.[1]

In Monell v. Department of Social Services, 436 U.S. 658, 694, 98 S.Ct. 2018 (1978), the

---

[1]Plaintiff's initial complaint and his First Amended Complaint named only the City of Minneapolis as a Defendant, and asserted only three causes of action. His Second Amended Complaint adds Dr. Jeffrey Ho as a Defendant and adds a new fourth cause of action which he asserts only against Dr. Ho. Although the first three causes of action do not distinguish between the Defendant City of Minneapolis, and Dr. Ho, the Court concludes from the language of the Second Amended Complaint, that Plaintiff continues to assert the first three causes of action only against the City of Minneapolis.

Supreme Court held that municipal bodies are not subject to claims of respondeat superior or vicarious liability under 42 U.S.C. § 1983. See also Oklahoma City v. Tuttle, 471 U.S. 808, 817-18, 105 S.Ct. 2427 (1985)(municipal liability should not be imposed when the municipality was not itself at fault); City of Canton v. Harris, 49 U.S. 109, 378, 388, 109 S.Ct. 1197 (1989); Adewale v. Whalen, 21 F.Supp.2d 1006 (D. Minn. 1998). The sole exception to this rule occurs when enforcement of a municipal policy or practice results in the deprivation of federally protected rights. Monell, 436 U.S. at 692; Adewale v. Whalen, 21 F.Supp. at 1012. For a municipality to be liable, a plaintiff must prove that a municipal policy or custom was the "moving force [behind] the constitutional violation." Mittler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999), citing Monell, 436 U.S. at 694, 98 S.Ct. 2018. Only "deliberate" actions by a municipality can meet the "moving force" requirement. Board of Commissioners v. Brown, 520 U.S. 397, 400, 117 S.Ct. 1382 (1997).

These standards may be satisfied by demonstrating either that injury arose from "action pursuant to official municipal policy of some nature" or through proof that the alleged misconduct was so pervasive among non-policy making employees of the municipality as to constitute a custom or usage with the force of law. Mettler, 165 F.3d at 1204; McGautha v. Jackson County, Mo. Collection Department, 36 F.3d 53, 55-56 (8th Cir. 1994); Thelma D. ex. rel. Delores A. v. Board of Education, 934 F.2d 929, 932 (8th Cir. 1991). Liability under the latter theory cannot arise from a single act. Mettler, 165 F.3d at 1205. Mettler also contains a more explicit set of requirements for successful proof of the existence of a custom or practice. Id. at 1204. Under these requirements, a plaintiff must prove:

> 1. The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the government entity's employees;
>
> 2. Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policy making officials after notice to the officials of that misconduct; and
>
> 3. Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, i.e. [proof] that the custom was the moving force behind the constitutional violation.

Id. (citing Jane Doe "A" v. Special Sch. Dist., 901 F.2d 642, 646 (8th Cir. 1990)). Under these requirements, Plaintiff's claims against the City must fail. Assuming that a constitutional violation took place, there is no evidence that it was the product of a "pattern of unconstitutional misconduct" by the Minneapolis Police, no evidence of deliberate indifference to or tacit authorization of such conduct, and no evidence that the custom was the moving force behind the constitutional violation.

Accordingly, Plaintiff's only chance of recovery under § 1983 is to demonstrate that Dr. Ho's actions were taken pursuant to an official policy. Examination of the record reveals that they were not. Plaintiff has failed to identify, either in his Second Amended Complaint or in answer to an Interrogatory, any specific policy of the City of Minneapolis Police Department which would permit or allow improper police conduct.

In answer to Defendants' Interrogatory No. 11, Plaintiff recites the facts surrounding the incident giving rise to his claims against the City and Dr. Ho. Other than stating his subjective, conclusory "belief" that the unlawful police action was done pursuant to "official policy, practice, or custom," Plaintiff's Interrogatory answer fails to identify any such policy, practice or custom which authorized the alleged unlawful conduct.

As Plaintiff has failed to identify any policy, custom, or practice pursuant to which he claims his constitutional rights were violated, the City is entitled to summary judgment on Plaintiff's first three causes of action.

**C. Claims Against Dr. Ho**

Plaintiff's fourth cause of action alleges that Defendant Dr. Jeffrey Ho acted illegally in a variety of ways.

At least two legal theories compel the conclusion that Plaintiff's claims against Dr. Ho must fail. First, Plaintiff has failed to sue Dr. Ho in his individual capacity; and second Dr. Ho is entitled to qualified immunity.

The Eighth Circuit requires that a plaintiff who sues a governmental official in his individual capacity must specifically acknowledge that fact in the Complaint. Nix v. Norman, 879 F.2d 429 (8th Cir. 1989). If a plaintiff fails to do so, the official will only be deemed to have been sued in their official capacity. Egerdahl v. Hibbing Community College, 72 F.3d 615, 620 (8th Cir. 1995); Artis v. Francis Howell North Band Boosters Assoc., 161 F.3d 1178, 1182 (8th Cir. 1992)("if the complaint does not specifically name the defendant in his individual capacity, it is presumed that he is sued only in his official capacity"); Murphy v. Arkansas, 127 F.3d 750 (8th Cir. 1997)(same).

The difference between naming a government official in their individual capacity versus naming them in their official capacity cannot be overestimated. A suit against an individual in his or her official capacity is treated as an action directly against the public entity of which the official is an agent. Roberts v. Dillion, 15 F.3d 113, 115 (8th Cir. 1994). In this case, therefore, naming Dr. Ho in his official capacity results in the incorporation of the claims against him into

the larger claims against the City of Minneapolis, and their summary dismissal.

The second reason why the claims against Dr. Ho fail is that, even if the Court permits Plaintiff to sue Dr. Ho individually despite the fact that he was not specifically named as a Defendant in his individual capacity, the doctrine of qualified immunity precludes any recovery by Plaintiff. Qualified immunity works to protect municipal officials from personal liability for federal claims "unless the officials' conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Cornell v. Woods, 69 F.3d 1383, 1390 (8th Cir. 1995), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982). A clearly established right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995), quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039 (1987); Mettler, 165 F.3d 1197, 1202-3 (8th Cir. 1999). The analysis focuses on the objective legal reasonableness of an official's acts. Harlow, 457 U.S. at 819, 102 S.Ct. at 2739. Application of qualified immunity is a question of law to be determined by the court. Ludwig, 54 F.3d at 470.

Analysis of a claim of qualified immunity requires determination of whether: (1) Plaintiff has asserted a violation of a constitutional right; (2) the applicable law pertaining to the constitutional right in question was clearly established at the time of the violation; and (3) Plaintiff can demonstrate that the defendant's actions were objectively unreasonable in light of the law and information they possess at the time. Mettler, 165 F.3d at 1202-3; Lawson v. Hulm, 223 F.3d 831, 834 (8th Cir. 2000).

Defendants concede that Plaintiff's right to not be the victim of excessive force was

clearly established at the time he was handcuffed. Defendant's Memorandum in Support of Motion for Summary Judgment at 23. They make their challenge on the issue of objective reasonability. Id. at 24. Objective reasonability in the context of an excessive force claim is determined by considering whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to the underlying intent or motivation. Lawson, 223 F.3d at 834. The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene. Id. Inherent in this calculus is recognition of the fact that police officers are often required to make quick judgments in uncertain circumstances. Id.

If Dr. Ho was a police officer with the power of arrest, there would be no question that the amount of force applied to Plaintiff while he was being handcuffed was objectively reasonable under the above standards. With the exception of not putting on the handcuffs tight enough, a fact which suggests the application of *less* force than was necessary, Dr. Ho's actions were in full compliance with police procedure, and the Court concludes that it was objectively reasonable for Dr. Ho, in the instant circumstances, to handcuff Plaintiff.

Plaintiff also claims that Dr. Ho breached his contract with the City, violated his oath as a physician, and exceeded the scope of his authority when he caused Plaintiff's injuries while handcuffing him. The Court concludes that Plaintiff lacks standing to assert that Dr. Ho breached his contract with the City, violated his oath as a physician, or exceeded the scope of his authority. See e.g. Veerkamp v. Farmers Coop Creamery, 573 NW2d 715, 717 (MN App. 1988). As Defendant Ho has demonstrated that his conduct did not deliberately violate any clearly established right of the Plaintiff, he is entitled to qualified immunity under Harlow v. Fitzgerald,

457 U.S. 800 (1982).

## III. RECOMMENDATION

Based upon the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendants' Motion for Summary Judgment [#26] be **GRANTED in its entirety**.

DATED: November 5, 2001

FRANKLIN L. NOEL
Chief Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, within ten days of service of this Report and Recommendation, written objections which specifically identify the portions of the proposed findings, recommendations or report to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service of the objections. All briefs filed under this rule shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Circuit Court of Appeals.